**FILED**

NOV 2 1 2018

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 18-315 |
| | **[UNDER SEAL]** |
| ARLINDA MORIARTY | |
| DAYNELLE DICKENS | (18 U.S.C. §§ 2, 1035(a)(1), 1028A(a)(1), |
| JULIE WILSON | 1347 & 1349) |
| TAMIKA ADAMS | |
| TONY BROWN | |
| TERRY ADAMS | |
| TERRA DEAN | |
| TIONNE STREET | |
| KEITH SCOGGINS | |
| TIA COLLINS | |
| LARITA WALLS | |
| LUIS COLUMBIE-ABREW | |

## INDICTMENT

## COUNT ONE

The grand jury charges:

## GENERAL ALLEGATIONS

Unless otherwise indicated, at all relevant times:

**A.     The Medicaid Program**

1.      Medicaid was a federal "health care benefit program," as defined by Title 18, United States Code, Section 24(b), co-funded by federal and state governments, that provided medical assistance for indigent individuals who were aged, blind, disabled, or members of families with dependent children.

2.      The Centers for Medicare and Medicaid Services, a component of the United States Department of Health and Human Services, monitored the state-run Medicaid programs,

established requirements for service delivery, quality, funding, and eligibility standards, determined the scope and types of covered services, and set reimbursement rates.

3.      In the Commonwealth of Pennsylvania, Medicaid ("PA Medicaid") was administered by the Department of Human Services ("DHS"), previously known as the Department of Public Welfare.

4.      PA Medicaid required that covered or insured individuals receive approved services from a Medicaid-enrolled provider ("PA Medicaid Provider") within the scope of the provider's license and in accordance with all state and federal requirements.

5.      To become a PA Medicaid Provider, an entity was required to submit an enrollment application along with certain supporting documentation.   As part of the application process, PA Medicaid Providers agreed, among other things, (a) to comply with all applicable state and federal laws, regulations, and policies governing participation in PA Medicaid; (b) to maintain documentation of the services rendered to covered or insured individuals; and (c) to certify for each submitted PA Medicaid claim that the services or items for which payment was claimed were actually provided by the PA Medicaid Provider to the covered or insured individual identified in the claim.

6.      In general, PA Medicaid reimbursed PA Medicaid Providers for covered services based on established fees depending on the services identified on the claim and the qualifications of the individual providing the claimed services.

7.      PA Medicaid Providers received payment for covered services through the submission of claims for payment to DHS, either on paper or electronically through DHS' claims-processing and information-management system.   Such claims for payment submitted by a PA Medicaid Provider included information about the covered or insured individual, the nature of the

2

service provided, the charge for the service provided, and the date or dates of service, among other things.  In connection with the processing of PA Medicaid claims, each covered or insured individual was assigned a unique Recipient Number, which was further associated in the PA Medicaid system with other personal means of identification, including the individual's date of birth and Social Security Number.

8.      In conjunction with their enrollment applications, as a condition of payment PA Medicaid Providers were required to certify that the information contained in the claims was true, accurate, and complete; acknowledge that payment and satisfaction of the claim was made from federal and state funds; and acknowledge that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable federal or state laws.

9.      PA Medicaid Providers were responsible for the accuracy of all of the information provided on PA Medicaid claim forms.

**B.      The Home and Community-Based Services Waiver Program**

10.     Home and Community-Based Services Waiver Programs (collectively, the "Waiver Program") were authorized by Section 1915(c) of the Social Security Act, 42 U.S.C. § 1396n(c), and were administered by PA Medicaid through DHS' Office of Long-Term Living ("OLTL").

11.     The Waiver Program allowed qualified individuals covered or insured by PA Medicaid to receive certain home- and community-based services designed to enable the individuals to continue residing at their homes and in their communities and, as such, to avoid institutionalization.   To that end, the Waiver Program permitted participating states, including the Commonwealth of Pennsylvania, to obtain a waiver of the federal Medicaid rules that might otherwise require institutional care as a basis for Medicaid coverage and reimbursement.   PA

Medicaid funds designated for coverage of institutional care were therefore reallocated to support the Waiver Program.

12.     Pennsylvania had broad discretion to design its Waiver Program to address the needs of its target population and to enable covered or insured individuals to remain in the community rather than be admitted to a nursing home or other long-term care facility.

13.     For purposes of the Waiver Program, insured or covered individuals were referred to as "Consumers."

14.     Waiver Program services included, among other things, (a) Personal Assistance Services ("PAS"); (b) Service Coordination; and (c) Non-Medical Transportation.

a.     PAS involved the assignment of a Personal Care Attendant ("Attendant") to assist the Consumer with various daily living activities in the Consumer's home, including bathing, dressing, light cleaning, meal and medication preparation, and other non-medical household chores, requiring the physical presence and assistance of an Attendant.

b.     Service Coordination services included assisting Consumers with preparing so-called individual service plans ("ISPs")—i.e., individualized plans outlining, among other things, which services were necessary, on which days of the week, and for what periods of time—and the related services budget that was submitted for approval by OLTL as part of the Waiver Program.   Service Coordination also entailed coordinating and monitoring services on an ongoing basis, including PAS care, to ensure that Consumers were receiving the care specified in their ISPs and approved by OLTL.   Individuals who provided Service Coordination on behalf of PA Medicaid Providers as part of the Waiver Program were referred to as Service Coordinators.

c.     Non-Medical Transportation involved the provision of transportation services to Consumers so that they could utilize available and approved services and participate in

4

and benefit from other community activities and resources.   Non-Medical Transportation benefits covered mileage costs for drivers to transport Consumers, as well as the purchase of transit passes, tickets, or tokens to secure other means of transportation, as necessary.

15.     To participate in the Waiver Program, a Consumer was required to be approved by a physician and have an ISP and budget approved by OLTL.   Once OLTL approved the ISP and budget, the Consumer was authorized to receive services from an approved provider.

16.     PA Medicaid Providers were permitted to participate in the Waiver Program after signing a provider agreement, which, like the PA Medicaid enrollment application, required the provider to agree to abide by all applicable federal and state laws, including policy manuals, policy changes, and other documents governing PA Medicaid and the Waiver Program.

17.     The Waiver Program enrollment application also required enrolling PA Medicaid Providers to agree to maintain adequate documentation in support of the services rendered to Consumers and for which claims were submitted for payment to PA Medicaid.   For example, PA Medicaid Providers were required to maintain accurate timesheets reflecting an Attendant's provision of PAS care to a Consumer, as well as accurate notes of all Service Coordination provided to a Consumer.

### C.     The Defendants, Co-Conspirators, and Relevant Entities

18.     Defendant ARLINDA MORIARTY was the owner and operator of, among other entities, Moriarty Consultants, Inc. ("MCI") and Activity Daily Living Services, Inc. ("ADL"), Pennsylvania corporations incorporated in 2004 and 2007, respectively.   At various times, defendant ARLINDA MORIARTY was referred to as the president or chief executive officer of MCI and ADL.

19.    Until in and around 2012, MCI and ADL provided both PAS and Service Coordination support to Consumers enrolled in the Pennsylvania Waiver Program.   After in and around 2012, and as a result of changes to Pennsylvania law related to the Waiver Program, MCI and ADL were prohibited from providing both types of waiver services.   As a result, MCI discontinued providing Service Coordination to Consumers and ADL discontinued providing PAS care.

20.    Defendant DAYNELLE DICKENS was defendant ARLINDA MORIARTY's sister and, until in and around 2012, acted as the chief financial officer of MCI.   Beginning in and around 2012, DAYNELLE DICKENS was the owner and operator of Coordination Care, Inc. ("CCI"), a Pennsylvania corporation created in response to changes to Pennsylvania law related to the Waiver Program.   CCI provided Service Coordination support to Consumers, many of whom previously received Service Coordination from MCI prior to in and around 2012.

21.    MCI, ADL, and CCI each operated in the Western District of Pennsylvania, and each entity was a PA Medicaid Provider approved to participate in the Waiver Program.

22.    Everyday People Staffing, Inc. ("EPS") was a Pennsylvania corporation incorporated in 2012 that provided staffing and back-office support for MCI, ADL, and CCI. Defendant ARLINDA MORIARTY was the owner and operator of EPS.   At various times, defendant DAYNELLE DICKENS managed the finances and exercised check-writing authority for MCI, ADL, CCI, and EPS, despite having no formal affiliation with MCI and ADL.

23.    Notwithstanding the formal separation between MCI, ADL, CCI, and EPS, defendant ARLINDA MORIARTY exercised de facto control over all entities, and both defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS regularly commingled, or caused the commingling of, the entities' resources.

24.     Until in and around 2012, defendant JULIE WILSON was responsible for claims processing and billing matters related to PA Medicaid and the Waiver Program on behalf of MCI. In and around 2012, defendant JULIE WILSON's employment nominally was transferred to EPS, although her principal job responsibilities remained the same.   In her role overseeing billing, defendant JULIE WILSON routinely created reports detailing which Consumers had utilized all of their authorized PAS and Service Coordination hours in a given timeframe.

25.     Co-conspirator Travis Moriarty was a relative of ARLINDA MORIARTY and an employee of MCI, where he held various titles, including Attendant and eventually PAS Manager. As PAS Manager at the Perrysville Avenue MCI office in Pittsburgh, Pennsylvania, Travis Moriarty supervised various additional office staff.

26.     Defendant LARITA WALLS was an employee of MCI, who held the title PAS Coordinator and reported to Travis Moriarty at the Perrysville Avenue MCI office.

27.     Defendant KEITH SCOGGINS was Travis Moriarty's supervisor and held the title PAS Director.

28.     Defendant TERRA DEAN was an employee of MCI, who held the title PAS Manager and worked at the East Liberty MCI office in Pittsburgh, Pennsylvania.   Although defendant TERRA DEAN's primary job responsibilities as PAS Manager mirrored those of Travis Moriarty, the two worked in separate MCI office locations and managed information related to different sets of MCI Consumers.

29.     Collectively, the PAS staff at MCI were responsible for, among other things, hiring Attendants, maintaining personnel files for Attendants, assigning Attendants to Consumers who were authorized to receive PAS care, and collecting timesheets from Attendants and Consumers.

30.     Co-conspirator Tiffhany Covington was employed as a Service Coordinator at ADL.   At various times, Tiffhany Covington was also employed as an Attendant with MCI.

31.     PAS staff, including defendant KEITH SCOGGINS, defendant TERRA DEAN, defendant LARITA WALLS, and Travis Moriarty, were required to communicate with Consumers' Service Coordinators, including Tiffhany Covington and other Service Coordinators employed by ADL, regarding Consumers' approved ISPs, number of approved hours, types of care needed, and feedback regarding assigned Attendants, among other things.

32.     Defendant TIONNE STREET and defendant LUIS COLUMBIE-ABREW were employed by MCI as Attendants and received compensation for purported care they provided to Consumers in the Pittsburgh area.   After in and around 2011, defendant LUIS COLUMBIE-ABREW resided permanently in the State of Georgia.

33.     Defendant TAMIKA ADAMS was employed in various roles at ADL, including, at one time, as executive director of the company.   At various times, defendant TAMIKA ADAMS was also employed as an Attendant with MCI and as an employee of EPS.   Defendant TAMIKA ADAMS was defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS's cousin.

34.     Defendant TONY BROWN was defendant TAMIKA ADAMS's father and defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS's uncle.   Defendant TONY BROWN performed various tasks at MCI, including data entry, for which he received significant, untaxed payments, in the form of checks, from defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS.   At no time was defendant TONY BROWN employed as an Attendant at MCI.

35.    Defendant TERRY ADAMS was defendant TAMIKA ADAMS's husband and a Consumer enrolled in the Waiver Program.

36.    ARLINDA MORIARTY regularly communicated with defendant DAYNELLE DICKENS, defendant TAMIKA ADAMS, and defendant JULIE WILSON, among others, regarding the need to increase billings and the fact that timesheets often were missing.

37.    Periodically, state agencies conducted audits of MCI, ADL, and CCI to ensure compliance with applicable PA Medicaid and Waiver Program requirements. Among other things, auditors reviewed Attendant files, Consumer files, PAS timesheets, and other documentation required to be maintained by the relevant entity. The absence of required documentation, among other factors, could lead to revocation of the entities' enrollment in the Waiver Program.

38.    Between in and around 2011 and in and around 2017, PA Medicaid paid MCI between approximately $16 and $19 for each claimed hour of PAS care, and MCI in turn paid Attendants on average between $8 and $10 per hour. Depending upon his or her ISP, a Consumer could be eligible for up to a maximum of 168 hours of PAS care per week. Service Coordination was reimbursed at a rate of between approximately $14 and $21 per hour, with an average of 3 hours of such care authorized per month for each Consumer, absent certain extenuating circumstances justifying an increase.

39.    Between in and around January 2011 and in and around April 2017, PA Medicaid paid MCI, ADL, and CCI, collectively, more than $87,000,000 based on claims submitted as part of the Waiver Program. PAS payments accounted for more than $80,000,000 of the total amount reimbursed.

## THE CONSPIRACY

40.     From in and around January 2011, and continuing thereafter to in and around May 2017, in the Western District of Pennsylvania and elsewhere, the defendants, ARLINDA MORIARTY, DAYNELLE DICKENS, JULIE WILSON, TAMIKA ADAMS, TONY BROWN, TERRY ADAMS, TERRA DEAN, TIONNE STREET, KEITH SCOGGINS, TIA COLLINS, LARITA WALLS, and LUIS COLUMBIE-ABREW, knowingly and willfully did conspire, combine, confederate, and agree with each other and other individuals, both known and unknown to the grand jury, to commit an offense against the United States, that is, health care fraud, in violation of Title 18, United States Code, Section 1347.

## PURPOSE OF THE CONSPIRACY

41.     The purpose of the conspiracy was for the defendants and their co-conspirators to obtain PA Medicaid reimbursements—as well as salary payments associated with such reimbursements—based on the submission of fraudulent Waiver Program claims for PAS, Service Coordination, and Non-Medical Transportation services that were never provided to the Consumers identified on the claims or for which there was insufficient or fabricated documentation to justify reimbursement.

## MANNER AND MEANS OF THE CONSPIRACY

42.     It was a manner and means of the conspiracy that certain office workers at MCI, ADL, and EPS, including defendant JULIE WILSON, defendant TAMIKA ADAMS, defendant TONY BROWN, defendant TIA COLLINS, defendant TERRA DEAN, defendant KEITH SCOGGINS, defendant LARITA WALLS, co-conspirator Travis Moriarty, and co-conspirator Tiffany Covington, would fabricate timesheets to reflect PAS care they provided as Attendants to eligible Consumers, when, in fact, no such care occurred.

10

43.     It was a further manner and means of the conspiracy that certain office workers at MCI, ADL, and EPS, including defendant TAMIKA ADAMS, defendant TIA COLLINS, defendant TERRA DEAN, defendant KEITH SCOGGINS, defendant LARITA WALLS, co-conspirator Travis Moriarty, and co-conspirator Tiffhany Covington, used the names of "ghost" Attendants on falsified timesheets, in some cases at defendant ARLINDA MORIARTY's direction.   Some of the "ghost" Attendants allowed their names to be used in this manner, often in exchange for a portion of the resulting salary payments derived from PA Medicaid disbursements.   Other such individuals, however, had no knowledge of the fact of their fraudulent employment or that the defendants and their co-conspirators were receiving fraudulent salary payments in the unwitting individuals' names and as a result of the submission of fraudulent Waiver Program claims.

44.     It was a further manner and means of the conspiracy that Attendants employed by MCI, including defendant TIONNE STREET and defendant LUIS COLUMBIE-ABREW, submitted, or caused the submission of, falsified timesheets reflecting their provision of in-home PAS care that did not occur, including purported care during hours in which the Attendants were simultaneously working for a different employer or were living outside the area.

45.     It was a further manner and means of the conspiracy that falsified PAS claims were submitted to PA Medicaid for purported care of Consumers who were incarcerated, hospitalized, or deceased during the times reflected on the claims.

46.     It was a further manner and means of the conspiracy that office workers and Attendants, including defendant TAMIKA ADAMS, defendant TONY BROWN, defendant TIA COLLINS, defendant TERRA DEAN, defendant KEITH SCOGGINS, co-conspirator Travis Moriarty, and co-conspirator Tiffhany Covington, paid kickbacks to Consumers, including

11

defendant TERRY ADAMS, in exchange for the Consumers' agreement to sign, or permit their signature to be forged on, falsified timesheets for PAS care that did not occur.

47.     It was a further manner and means of the conspiracy that defendant ARLINDA MORIARTY caused PA Medicaid to be billed the maximum allowable reimbursement rate for Non-Medical Transportation on behalf of certain Consumers, when, in fact, few, if any, transportation costs had been accrued and, in certain circumstances, all or a portion of such reimbursement was paid to Consumers as part of a kickback arrangement.

48.     It was a further manner and means of the conspiracy that defendant JULIE WILSON obtained signature stamps for certain Consumers, which were used to sign falsified timesheets in support of falsified PA Medicaid claims.

49.     It was a further manner and means of the conspiracy that defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS directed employees, including defendant JULIE WILSON, co-conspirator Travis Moriarty, and co-conspirator Tiffhany Covington, to bill the maximum allowable PAS and Service Coordination hours for Consumers in order to maximize profits and to ensure that the state did not require MCI, ADL, and CCI to forfeit underutilized Consumer hours.   Many Consumers had no knowledge that, at defendant ARLINDA MORIARTY's direction, their personally identifiable information was used to submit fraudulent claims to PA Medicaid for Waiver Program benefits that the Consumers had not exhausted.

50.     It was a further manner and means of the conspiracy that, at the direction of defendant ARLINDA MORIARTY, defendant DAYNELLE DICKENS, and defendant JULIE WILSON, employees, including defendant TAMIKA ADAMS, fabricated documentation during the course of state audits of MCI, ADL, and CCI.   Fabricated documents included PAS timesheets, Service Coordination notes, criminal history checks for Attendants, child-abuse

12

clearance forms for Attendants, signed ISPs, and certain Consumer affidavits, among other things. As a result of such fabrications, defendant ARLINDA MORIARTY, defendant DAYNELLE DICKENS, and defendant JULIE WILSON, as well as other co-conspirators acting at their direction, were able to conceal the nature and scope of the fraud so that it could continue.

51.     It was a further manner and means of the conspiracy that defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS caused regular payments to be made via checks drawn from the bank accounts of MCI, ADL, and CCI to certain Consumers, including a relative of defendant ARLINDA MORIARTY, knowing that defendant JULIE WILSON was submitting, or causing the submission of, PA Medicaid claims for Waiver Program services that had not been provided to such Consumers.

52.     It was a further manner and means of the conspiracy that defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS caused payments totaling hundreds of thousands of dollars to be made to several of their personal associates and relatives from MCI bank accounts for performing little or no work, including their sibling and defendant DAYNELLE DICKENS's significant other, knowing that such payments were financed, in part, by the proceeds of the Waiver Program fraud.

53.     It was a further manner and means of the conspiracy that for the years in and around 2011 through in and around 2016 defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS paid themselves salaries totaling approximately $1,660,000 and $1,017,000, respectively, and issued to themselves additional business checks totaling hundreds of thousands of dollars, knowing that such salary payments and additional checks were financed, in part, by the proceeds of the Waiver Program fraud.

54.    It was a further manner and means of the conspiracy that MCI, ADL, and CCI obtained millions of dollars in payments from PA Medicaid as a result of the fraudulent submission of false Waiver Program claims.

### ACTS IN FURTHERANCE OF THE CONSPIRACY

**A.    Falsified Waiver Program Services By Office Workers And Attendants**

Defendant TAMIKA ADAMS, defendant TONY BROWN,
and defendant TERRY ADAMS

55.    Between in and around 2011 and in and around 2016, defendant TAMIKA ADAMS, defendant TONY BROWN, and defendant TERRY ADAMS fabricated timesheets—and caused the submission of corresponding PA Medicaid claims—reflecting PAS care that defendant TONY BROWN purportedly provided to defendant TERRY ADAMS, when in fact no such care was provided.   At various times, following the submission of false PA Medicaid claims, defendant TAMIKA ADAMS and defendant TERRY ADAMS would meet with defendant TONY BROWN at the Perrysville Avenue MCI office for the purpose of obtaining and splitting defendant TONY BROWN's resulting paycheck.   Defendant TAMIKA ADAMS also caused the submission of PA Medicaid claims for PAS care purportedly provided by "ghost" Attendants—for example, several other relatives—to defendant TERRY ADAMS, when in fact no such care was provided.   During this period of time, PA Medicaid disbursed more than $250,000 in payments for Waiver Program services purportedly provided to defendant TERRY ADAMS.

56.    Between in and around 2011 and in and around 2013, an individual known to the grand jury as TA resided with defendant TAMIKA ADAMS and was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.   During this time, defendant TAMIKA ADAMS caused the submission of PA Medicaid claims for PAS care that she

purportedly provided to TA, when, in fact, defendant TAMIKA ADAMS provided no such care.
For example, on or about April 1, 2013, defendant TAMIKA ADAMS sent an email to defendant
JULIE WILSON and other billing staff, attaching four MCI timesheets purporting to document
PAS care that defendant TAMIKA ADAMS provided to TA during four consecutive weeks in
March 2013.   Each timesheet reflected a total of 80.5 hours of PAS care, including 20 hours of
care each Saturday, 20.5 hours of care each Sunday, and 40 hours of care between Monday and
Friday.   During this time, defendant TAMIKA ADAMS was nominally employed full-time as the
president of ADL, and she was therefore aware that PA Medicaid Providers were prohibited from
billing for any hours during which an Attendant was sleeping.

57.     During the time that TA resided with defendant TAMIKA ADAMS, defendant
TAMIKA ADAMS also caused the submission of false PA Medicaid claims for the reimbursement
of purported Non-Medical Transportation expenses that were never incurred by TA, and which
reimbursements defendant TAMIKA ADAMS converted to her own use.

58.     On or about October 29, 2013, defendant TAMIKA ADAMS sent an email to
defendant DAYNELLE DICKENS, stating:

> I really would like to see what can be done with my [Consumer TA] hours.  I
> cannot afford to lose them, and I thought we were going to fix this.  I do not want
> any conflicts with [TA] or [defendant TERRY ADAMS], being that I am the head
> of ADL which is the agency that provides their [Service Coodination].

Defendant TAMIKA ADAMS further explained in the email that she had instructed co-conspirator
Tiffhany Covington to list TA's address with an apartment number in the PA Medicaid system,
the effect of which would be to make it appear as though TA did not live with defendant TAMIKA
ADAMS.   Defendant TAMIKA ADAMS further instructed defendant DAYNELLE DICKENS
that TA's power-of-attorney paperwork should be removed from MCI records "because I am listed

on those as well." At all relevant times, Defendant TAMIKA ADAMS was aware that Waiver Program rules prohibited individuals from providing PAS care in an Attendant capacity to Consumers for whom they were also serving as power-of-attorney. In the email, defendant TAMIKA ADAMS further expressed concern about the fact that she was defendant TERRY ADAMS's power-of-attorney while also serving, and causing claims to be submitted, as his Service Coordinator at ADL.

59.     In and around October 2012, an MCI Attendant known to the grand jury as TL-P—defendant TAMIKA ADAMS's friend—suffered a significant injury and ceased providing PAS care to Consumers.

60.     Between in and around November 2012 and in and around January 2014, defendant TAMIKA ADAMS caused the submission of PA Medicaid claims for PAS care that TL-P purportedly provided to various Consumers, without TL-P's knowledge and when in fact no such care had been provided to the Consumers identified in the claims. Defendant TAMIKA ADAMS further misused TL-P's personally identifiable information to obtain salary payments—in the form of payroll checks and direct deposits to bank accounts controlled by defendant TAMIKA ADAMS—that were generated as a result of the fraudulent PA Medicaid claims concerning TL-P's fictitious Consumer care.

<u>Defendant TIA COLLINS</u>

61.     Between in and around 2011 and in and around 2016, individuals known to the grand jury as SD, ID, and MD were Consumers eligible to receive Waiver Program services from MCI, ADL, or both. SD, ID, and MD were members of the same family and resided in the same house. During this time, defendant TIA COLLINS caused the submission of PA Medicaid claims for PAS care that either she or a "ghost" Attendant purportedly provided to SD, ID, and MD, when

in fact no such care was provided.   Defendant TIA COLLINS paid or caused other individuals to pay SD, ID, and MD kickbacks—for example, $160 biweekly—in exchange for the Consumers' participation in the fraudulent arrangement.   Likewise, during this time, defendant TIA COLLINS also caused the submission of false PA Medicaid claims for the reimbursement of purported Non-Medical Transportation expenses that were never incurred by SD, ID, and MD.   Defendant TIA COLLINS further paid or caused other individuals to pay the resulting Non-Medical Transportation reimbursements to SD, ID, and MD as additional kickbacks for their participation in the fraudulent arrangement.   During this period of time, PA Medicaid disbursed to MCI and ADL more than $350,000 in total payments for Waiver Program services purportedly provided to SD, ID, and MD.

Defendant TIONNE STREET

62.     Between in and around 2011 and in and around 2014, an individual known to the grand jury as KH was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.   During that time, defendant TIONNE STREET, as KH's Attendant, caused the submission of false PA Medicaid claims for PAS care that she never provided to KH, and, as a result, PA Medicaid disbursed approximately $60,000 in total payments to MCI and ADL.

63.     Between in and around 2014 and in and around 2016, defendant TIONNE STREET caused the submission of false PA Medicaid claims for PAS care that she never provided to more than a half dozen additional Consumers enrolled with MCI and ADL, resulting in PA Medicaid disbursements totaling approximately $10,000.   Many of the falsified timesheets defendant TIONNE STREET submitted, or caused to be submitted, in support of the fictitious care of these additional Consumers reflected purported care during hours in which defendant TIONNE STREET was actually working for a different employer.

Defendant TERRA DEAN

64.    Between in and around 2014 and in and around 2016, defendant TERRA DEAN caused the submission of false PA Medicaid claims for PAS care that neither she nor multiple "ghost" Attendants—including a close relative and the significant other of another close relative— ever provided to more than a half dozen Consumers enrolled with MCI and ADL, including Consumers known to the grand jury as DH, FB, and JJ, resulting in PA Medicaid disbursements totaling in excess of $150,000.

Defendant KEITH SCOGGINS

65.    Between in and around 2011 and in and around 2015, an individual known to the grand jury as TN was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.    During that time, defendant KEITH SCOGGINS caused the submission of PA Medicaid claims for PAS care that either he or a "ghost" Attendant—his close relative—purportedly provided to TN, when in fact no such care was provided.    Defendant KEITH SCOGGINS paid TN cash kickbacks—for example, $160 biweekly—in exchange for TN's participation in the fraudulent arrangement, and for TN's agreement to sign blank timesheets.    During this period of time, PA Medicaid disbursed to MCI and ADL more than $100,000 in total payments for Waiver Program services purportedly provided to TN.

Defendant LUIS COLUMBIE-ABREW

66.    At various times between in and around 2011 and in and around 2015, individuals known to the grand jury as SS and PW were Consumers eligible to receive Waiver Program services from MCI, ADL, or both.    SS and PW resided in and around Pittsburgh, Pennsylvania. On or about November 29, 2011, defendant LUIS COLUMBIE-ABREW sent an email to

18

defendant ARLINDA MORIARTY, defendant DAYNELLE DICKENS, and defendant JULIE WILSON, notifying them that he had moved to a new address in Atlanta, Georgia.

67.   During the time that SS and PW were eligible to receive Waiver Program services, defendant LUIS COLUMBIE-ABREW caused the submission of numerous PA Medicaid claims for PAS care that either he or, at certain times, a "ghost" Attendant—his close associate—purportedly provided to SS and PW, when in fact no such care was provided.   During this time, defendant LUIS COLUMBIE-ABREW and the "ghost" Attendant resided permanently in the State of Georgia.   During SS's and PW's respective periods of Waiver Program-eligibility, PA Medicaid disbursed to MCI and ADL a total of approximately $315,000 for PAS care purportedly provided to the Consumers.

68.   On or about February 13, 2014, defendant ARLINDA MORIARTY's document-management contractor, an individual known to the grand jury as BW, sent an email to defendant JULIE WILSON, attaching several incomplete timesheets for SS, several of which identified defendant LUIS COLUMBIE-ABREW as having provided 63 hours of PAS care but with no further details.   Two of the attached timesheets had no hours listed at all.   In the email, BW asked, "Julie can you please explain how anything was billed for [SS] based on these timesheets? Because we don't have access to the 2014 timesheets yet for scanning, I question is [SS] still being billed for and do the current time sheets still look like this?   If so, who is approving for this to be done in this manner?   This is an extremely serious situation."   Defendant JULIE WILSON subsequently forwarded BW's email to defendant ARLINDA MORIARTY, who sent it to defendant DAYNELLE DICKENS.   None of the PA Medicaid claims related to the SS timesheets attached to BW's email were ever voided, and none of the resulting payments were refunded to PA Medicaid.

19

Defendant LARITA WALLS

69.     Between at least in and around 2011 and in and around 2016, an individual known to the grand jury as LO was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.  During that time, defendant LARITA WALLS caused the submission of PA Medicaid claims for PAS care that either she or "ghost" Attendants—her close relatives—purportedly provided to LO, when in fact no such care was provided.  Defendant LARITA WALLS paid LO cash kickbacks—for example, $150 biweekly—in exchange for LO's participation in the fraudulent arrangement, and for LO's agreement to sign blank timesheets. Likewise, during this time, defendant LARITA WALLS also caused the submission of false PA Medicaid claims for the reimbursement of Non-Medical Transportation expenses that were never incurred by LO.  Defendant LARITA WALLS paid the resulting Non-Medical Transportation reimbursements to LO as additional kickbacks for LO's participation in the fraudulent arrangement.   During this time, PA Medicaid disbursed approximately $180,000 in total payments to MCI and ADL for PAS care purportedly provided to LO.

Co-conspirators Travis Moriarty and Tiffhany Covington

70.     At various times between in and around 2011 and 2017, individuals known to the grand jury as DW, RF, EM, SR, RS, and AS were Consumers eligible to receive Waiver Program services from MCI, ADL, or both.  During this time, co-conspirator Travis Moriarty and co-conspirator Tiffhany Covington caused the submission of numerous PA Medicaid claims for PAS care that either they or various "ghost" Attendants purportedly provided to DW, RF, EM, SR, RS, and AS, when in fact no such care was provided.  During DW's, RF's, EM's, SR's, RS's, and AS's periods of Waiver Program-eligibility, PA Medicaid disbursed to MCI and ADL a total of approximately $860,000 for PAS care purportedly provided to these Consumers.

Fraudulent PA Medicaid Claims Related to Consumer AM

71.     On or about February 26, 2013, an ADL employee sent an email to defendant JULIE WILSON regarding an individual known to the grand jury as AM, a Consumer receiving PAS care from MCI.   In the message, the employee stated:

> I spoke with Arlinda and I told her about the timesheet ending in 2/16/13 that was submitted for [AM] while she was in the hospital.   Arlinda told me to email you to tell you to contact her about the situation.   I'm not sure how she wants to handle the situation because she didn't say whether she wants you to void the claim or not. All she said was for you to contact her."

72.     Between on or about February 7, 2013, and on or about March 30, 2013, AM was admitted in an in-patient capacity for treatment at two medical facilities.   For the period from on or about February 3, 2013, through on or about March 30, 2013, PA Medicaid disbursed to MCI and ADL a total of more than $7,000 for PAS and Service Coordination services that were never provided to AM.   At no time did defendant ARLINDA MORIARTY or defendant JULIE WILSON void any of the PA Medicaid claims submitted during AM's hospitalization, or otherwise refund the resulting Waiver Program reimbursements.

## B.     False Billing For Unused Consumer PAS And Service Coordination Hours

73.     Between at least in and around 2011 and in and around 2015, defendant ARLINDA MORIARTY caused defendant JULIE WILSON and other employees to gather information about Consumers who had "unused" PAS care hours—that is, hours of authorized PAS care that had not been performed and, as a result, had not been billed to PA Medicaid.

74.     During this time, defendant JULIE WILSON would provide lists of such Consumers and their "unused" hours to defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS, and defendant ARLINDA MORIARTY would direct defendant JULIE

WILSON to submit false claims, in bulk, for some or all of the "unused" Consumer hours—without the knowledge or consent of the relevant Consumers.

75.     During this time, defendant JULIE WILSON on occasion would send an additional list to defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS, identifying Consumers for whom timesheets needed to be fabricated and back-dated to justify the billing of "unused" hours, at least in part so that the Consumers' files would contain superficial documentary justification for the billings in the event of a state audit.

76.     On or about June 27, 2012, defendant JULIE WILSON sent defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS an email with the subject line "Time sheets needed."   In the message, defendant JULIE WILSON stated, "The list as you requested.   The attached list shows the consumer name & office.   I need time sheets totaling the hours in the right column for the time frames specified."   Attached to defendant JULIE WILSON's email was a list of approximately nineteen consumers enrolled with MCI in either the Philadelphia or Pittsburgh, Pennsylvania locations.   For each Consumer, the list identified between two and eighteen weeks of care during the period July 2011 through May 2012 for which the Consumers had "unused" hours.   The amount of "unused" hours identified per week ranged from 30 hours to 84 hours, depending upon the Consumer.   In total, defendant JULIE WILSON's email identified a total of more than 5,000 "unused" hours for which timesheets were needed, and for which PA Medicaid had disbursed in excess of $80,000 to MCI.

77.     On or about April 3, 2014, defendant JULIE WILSON sent an email to defendant ARLINDA MORIARTY with the subject line "unbilled PAS list" and attached a list of twenty Consumers enrolled with MCI in either the Philadelphia or Pittsburgh, Pennsylvania locations. The list identified between 76 and 2047.5 "available" hours, depending on the Consumer, for the

period July 2013 through December 2013, totaling more than $147,000 in "billable" PA Medicaid claims.   On or about the next day, April 4, 2014, defendant JULIE WILSON sent the same list to defendant ARLINDA MORIARTY a second time under the subject line "hours not used list."

78.     On or about April 10, 2014, defendant JULIE WILSON sent another email to defendant ARLINDA MORIARTY with the subject line "Unused PAS hours list."   The email contained an expanded list of Consumers and breakdown of "unused" hours totaling $164,280.75 in a column labeled "$$$."   On or about the same day, defendant JULIE WILSON forwarded the new list to defendant DAYNELLE DICKENS and another ADL employee.

79.     Between on or about April 11, 2014, and on or about July 18, 2014, defendant ARLINDA MORIARTY and defendant JULIE WILSON caused the submission of PA Medicaid claims for PAS care corresponding to the vast majority of "unused" hours identified by defendant JULIE WILSON in and around April 2014.   As a result, PA Medicaid paid reimbursements to MCI totaling at least $149,000 related to PAS care that was never provided.

80.     On or about August 4, 2014, defendant JULIE WILSON sent an email to defendant ARLINDA MORIARTY with the subject line "Summary of time sheets needed."   Attached to the email were lists of Consumers and hours for which timesheets were needed to justify thousands of "unused" hours that the defendants caused to be billed to PA Medicaid between in and around April 2014 and in and around July 2014.

81.     On or about December 3, 2014, defendant JULIE WILSON sent an email to defendant ARLINDA MORIARTY with the subject line "Unused hours review."   In the email, defendant JULIE WILSON stated, "Please review the summary attached and let me know who should be billed and who should not be."   Attached to the email was a list of ten Consumers receiving PAS care from MCI in either the Philadelphia or Pittsburgh, Pennsylvania locations.

The list, and accompanying spreadsheets for each Consumer, identified thousands of "unused" hours, with each Consumer having between 5 and 22.75 hours available per week, for the period July 2014 through November 2014.  The list contained a total under the "additional $$" column of approximately $43,000 in PA Medicaid reimbursements for such "unused" hours.

82.     On or about December 3, 2014, defendant JULIE WILSON sent defendant ARLINDA MORIARTY a follow-up email, stating, among other things, that they could not submit claims for the "unused" hours of one of the listed Consumers from defendant JULIE WILSON's December 3, 2014 email based on certain documentation that was already in the Consumer's file. At the end of the email, defendant JULIE WILSON asked defendant ARLINDA MORIARTY to "[p]lease advise if I should bill everyone [else]."

83.     On or about December 22, 2014, defendant JULIE WILSON sent an email to defendant DAYNELLE DICKENS's personal email address and attached a set of spreadsheets related to certain Consumers defendant JULIE WILSON previously had identified as having "unused" hours in her emails to defendant ARLINDA MORIARTY from earlier that month.  On the first attached spreadsheet, defendant JULIE WILSON included handwritten instructions as to how the "unused" hours should be billed to PA Medicaid.

84.     Between on or about December 23, 2014, and on or about December 26, 2014, dozens of PA Medicaid claims were submitted for the "unused" hours defendant JULIE WILSON had forwarded to defendant DAYNELLE DICKENS in her December 22, 2014 email.  As a result, PA Medicaid paid reimbursements to MCI totaling approximately $35,000 for PAS care that was never provided.

85.     From in and around 2011 through in and around 2013, defendant DAYNELLE DICKENS instructed defendant JULIE WILSON to submit claims to PA Medicaid for the

24

maximum amount of Service Coordination authorized per Consumer at MCI, ADL, and, later, CCI, under the Waiver Program at the beginning of each month and prior to the provision of any such services to the Consumers.

86.     On or about February 4, 2013, an individual known to the grand jury as an MCI employee sent an email to defendant JULIE WILSON, questioning what defendant JULIE WILSON had used as a basis for submitting maximum Service Coordination billings for CCI and ADL.   In a response on or about the same day, defendant JULIE WILSON stated, "My department was told to bill 12 units per month for ALL consumers until actual notes were provided for us to adjust the billings to."   Later on or about the same day, defendant DAYNELLE DICKENS sent an email to defendant JULIE WILSON and the MCI employee, stating:

> The way the fiscal department operates in [sic] on a reconciliation process, so we will bill the service and then adjust once the information is submitted.   This way it allows us to have continuous cash flow . . . . So Julie would have been operating directly under me . . . . It was always the service coordinators responsibility to justify the billing by submitting the proper documentation and letting us know who's [sic] should be refunded . . . .

87.     At all relevant times, defendant DAYNELLE DICKENS knew that PA Medicaid Providers were prohibited from billing for services that had not occurred, and at no point between in and around 2011 and in and around February 2013 were adjustments made to previously billed Service Coordination services to reflect which, if any, hours of such service actually were performed.   Defendant DAYNELLE DICKENS and defendant JULIE WILSON did not stop submitting, or causing the submission of, claims for the maximum authorized amount of Service Coordination until a different employee questioned the practice in or about March 2013.   Further, defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS did not authorize the

refund of any overbilled Service Coordination until approximately nine months later, in or about December 2013, when ADL's billing practices were being scrutinized as part of a state audit.

88.     On or about December 18, 2014, defendant TAMIKA ADAMS sent defendant ARLINDA MORIARTY and an individual known to the grand jury as an ADL employee an email regarding notes defendant TAMIKA ADAMS had created to justify Service Coordination billings. In the email, defendant TAMIKA ADAMS stated, "Here are the units for each note that I did . . . . I had to space them out so that they did not seem unreal . . . . Out of 122 notes I was able to put in 98 notes over the course of August 2014-November 25, 2014."  On or about the same day, defendant TAMIKA ADAMS forwarded the same email to defendant JULIE WILSON and defendant DAYNELLE DICKENS.

### C.     Defendant ARLINDA MORIARTY's And Defendant DAYNELLE DICKENS's Direct Payments To Consumers

89.     Between in and around 2011 and in and around 2015, an individual known to the grand jury as WM, a relative of defendant ARLINDA MORIARTY, was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.   During this time, defendant ARLINDA MORIARTY caused defendant JULIE WILSON to submit hundreds of PA Medicaid claims for PAS care that was never provided to WM, resulting in PA Medicaid disbursements to MCI and ADL totaling approximately $140,000.   Throughout WM's period of Waiver Program-eligibility, defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS issued regular checks to WM, drawn on MCI funds.

90.     Between in and around 2011 and in and around 2017, an individual known to the grand jury as PM was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.   During this time, defendant ARLINDA MORIARTY caused defendant JULIE WILSON

to submit hundreds of PA Medicaid claims for PAS care that was never provided to PM. Many

of these fraudulent claims were supported by no timesheet documentation at all, while others were

supported by falsified timesheets listing EB, a relative of defendant DAYNELLE DICKENS's

significant other, as a "ghost" Attendant. EB signed the falsified PM timesheets at the direction

of defendant DAYNELLE DICKENS, defendant JULIE WILSON, and defendant TAMIKA

ADAMS.

91.    Between in and around 2011 and in and around 2017, defendant ARLINDA

MORIARTY and defendant DAYNELLE DICKENS issued biweekly checks to PM, drawn on

MCI funds, each in an amount between approximately $500 and $900. At no time was PM an

employee of defendant ARLINDA MORIARTY, defendant DAYNELLE DICKENS, or any of

their related business entities.

92.    On numerous occasions while MCI was billing PA Medicaid for PM's purported

PAS care, PM would email defendant DAYNELLE DICKENS to ask about picking up PM's check

or to remind defendant DAYNELLE DICKENS that PM had yet to receive a check. For example,

on or about June 29, 2011, PM emailed defendant DAYNELLE DICKENS and asked if defendant

DAYNELLE DICKENS would issue two checks at once. In the email, PM stated, "I understand

that your company is not a bank, and I am very embarrassed to even ask if this is something that

you wound [sic] consider doing . . . ." Later the same day, defendant DAYNELLE DICKENS

responded, "After reviewing the cash flow, I will not be able to give you the money tomorrow,

however I can probably issue your check as early as next Wednesday." In total, during PM's

period of Waiver Program-eligibility, PA Medicaid disbursed to MCI and ADL a total of

approximately $285,000 for PAS care purportedly provided to PM.

93.     Between in and around 2011 and in and around 2015, an individual known to the grand jury as RM was a Consumer eligible to receive Waiver Program services from MCI, ADL, or both.   During this time, defendant ARLINDA MORIARTY caused defendant JULIE WILSON to submit hundreds of PA Medicaid claims for PAS care that was never provided to RM, resulting in PA Medicaid disbursements to MCI and ADL totaling in excess of $150,000.   Throughout RM's period of Waiver Program-eligibility, defendant ARLINDA MORIARTY and defendant DAYNELLE DICKENS issued regular checks to RM, drawn on MCI funds, each in the amount of approximately $750.   At no time was RM an employee of defendant ARLINDA MORIARTY, defendant DAYNELLE DICKENS, or any of their related business entities.

**D.     Fabrication Of Records To Conceal Fraud From State Auditors**

94.     In and around March 2013, defendant ARLINDA MORIARTY caused an MCI employee to draft a letter to Consumers, stating that "[o]ur agency is about to undergo an audit of our finances for the year of 2011 to the present" and requesting the Consumers' "assistance in this matter to reflect services delivered during that time period."   The letter continued, in part, "We realize that it may be difficult to recall services given so long ago, but if it will assist you, we can provide you with a copy of your plan and meet with you face to face to discuss things going on with your services at the that time to refresh your memory."   In the draft letter, which defendant ARLINDA MORIARTY subsequently forwarded to defendant JULIE WILSON, Consumers were asked to verify which services they received, including Service Coordination, PAS, and Non-Medical Transportation.

95.     On or about April 1, 2013, defendant TAMIKA ADAMS sent an email to defendant DAYNELLE DICKENS and defendant JULIE WILSON, attaching eight copies of the draft letter,

which had been placed on MCI letterhead.   Each of the letters was blank, with the exception of a forged signature at the bottom of the document above "Consumer signature."

96.     On or about July 23, 2013, defendant ARLINDA MORIARTY's document-management contractor, BW, sent an email to defendant DAYNELLE DICKENS and defendant TAMIKA ADAMS regarding documents requested by state authorities conducting an audit on behalf of the Pennsylvania Bureau of Financial Operations (BFO).   In the message, BW stated, "Attached are the time sheets for the Dates of Service requested by BFO.   Once you have the new time sheets send them back to me to be added in with the rest of the info for PAS and also Transportation."   The attached timesheets reflected PAS care purportedly provided to Consumer TA by defendant TAMIKA ADAMS and another individual.   One of the attached timesheets reflected 65.5 hours of purported care that defendant TAMIKA ADAMS provided to TA in September 2011, including a total of 36.5 hours of care on Saturday and Sunday.   Later during the BFO audit, defendant TAMIKA ADAMS caused a different timesheet to be submitted to state auditors, reflecting the same total number of hours for the week in question but with the weekend hours redistributed more evenly throughout the week.

97.     In and around June 2014, BFO auditors issued a report of their findings related to a review of MCI's billing practices.   The report identified numerous instances of insufficient documentation to support MCI's billings, including billings for PAS care that had purportedly been provided to defendant TERRY ADAMS, Consumer SS, and Consumer PM's spouse (who was also an enrolled Consumer).

98.     On or about September 4, 2014, defendant ARLINDA MORIARTY caused a response to be submitted to the BFO auditors on her and MCI's behalf.   As part of the response, and in an effort to convince BFO auditors to reverse their findings, defendant ARLINDA caused

29

to be submitted false affidavits bearing the names and purported signatures of Consumer SS, defendant TERRY ADAMS, and Consumer PM's spouse.   Defendant ARLINDA MORIARTY also caused to be submitted to the BFO auditors a false affidavit from defendant TONY BROWN, claiming that he was employed by MCI as an Attendant and that he had provided care to defendant TERRY ADAMS.

In violation of Title 18, United States Code, Section 1349.

## COUNT TWO

The grand jury further charges:

1.      Paragraphs 1 through 98 of Count One are hereby incorporated by reference as if re-alleged herein.

2.      From in and around January 2011, and continuing thereafter to in and around April 2017, in the Western District of Pennsylvania, and elsewhere, the defendants, ARLINDA MORIARTY, DAYNELLE DICKENS, JULIE WILSON, TAMIKA ADAMS, TONY BROWN, TERRY ADAMS, TERRA DEAN, TIONNE STREET, KEITH SCOGGINS, TIA COLLINS, LARITA WALLS, and LUIS COLUMBIE-ABREW, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, as defined by Title 18, United States Code, Section 24(b), namely PA Medicaid, and to obtain or cause to be obtained, by means of materially false and fraudulent pretenses, representations, and promises, money under the custody and control of such program in connection with the delivery of, and payment for, health care benefits and services, that is the defendants, individually and by aiding and abetting each other and others, submitted, or caused to be submitted, false and fraudulent claims to PA Medicaid for Waiver Program services, including PAS, Service Coordination, and Non-Medical Transportation.

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT THREE

The grand jury further charges:

1.      Paragraphs 1 through 98 of Count One are hereby incorporated by reference as if re-alleged herein.

2.      From in and around January 2011, and continuing thereafter to in and around April 2017, in the Western District of Pennsylvania, and elsewhere, the defendants, ARLINDA MORIARTY, DAYNELLE DICKENS, JULIE WILSON, and TAMIKA ADAMS, did knowingly and willfully conceal and cover up by trick, scheme, and device material facts, in connection with the delivery of and payment for health care benefits, items, and services involving a health care benefit program, as defined in 18 U.S.C. § 24(b), that is, the defendants, individually and by aiding and abetting each other and others, created or caused to be created false documentation, including PAS time sheets and Service Coordination notes, to conceal the fact that they had submitted, or caused to be submitted, false and fraudulent PA Medicaid claims related to Waiver Program services that were not provided to Consumers.

All in violation of Title 18, United States Code, Sections 1035(a)(1) and 2.

**COUNTS FOUR THROUGH SEVENTEEN**

The grand jury further charges that:

1.     Paragraphs 1 through 98 of Count One and paragraphs 1 and 2 of Count Two are hereby incorporated by reference as if re-alleged herein.

2.     On or about the Dates of Claim set forth below, in the Western District of Pennsylvania and elsewhere, the defendant, ARLINDA MORIARTY, during and in relation to a felony violation of 18 U.S.C. § 1347 (Health Care Fraud), as charged in Count Two of this Indictment, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, and aided and abetted the same, to wit, the name and Recipient Number of the Consumers identified at each count:

| Count | Date of Claim | Consumer | Dates of Service | Amount Reimbursed |
|-------|---------------|----------|------------------|-------------------|
| 4 | 4/11/2014 | AL | 1/19/2014 – 1/25/2014 | $1,351.35 |
| 5 | 4/26/2014 | TM | 7/7/2013 – 7/13/2013 | $1,029.60 |
| 6 | 4/29/2014 | WD | 7/7/2013 – 7/13/2013 | $858.00 |
| 7 | 4/30/2014 | DL-1 | 8/25/2013 – 8/31/2013 | $858.00 |
| 8 | 5/1/2014 | DJ | 9/29/2013 – 10/5/2013 | $1,185.44 |
| 9 | 5/1/2014 | LJ | 8/4/2013 – 8/10/2013 | $823.68 |
| 10 | 5/1/2014 | DA | 8/25/2013 – 8/31/2013 | $1,032.48 |
| 11 | 5/2/2014 | RK | 7/7/2013 – 7/13/2013 | $806.52 |
| 12 | 5/2/2014 | ST | 7/7/2013 – 7/13/2013 | $926.64 |
| 13 | 7/15/2014 | MS | 8/4/2013 – 8/10/2013 | $1,259.28 |
| 14 | 7/15/2014 | DP | 7/28/2013 – 8/3/2013 | $763.20 |

| Count | Date of Claim | Consumer | Dates of Service | Amount Reimbursed |
|-------|---------------|----------|------------------|-------------------|
| 15 | 7/17/2014 | DL-2 | 8/4/2013 – 8/10/2013 | $926.64 |
| 16 | 12/24/2014 | DE | 7/6/2014 – 7/12/2014 | $1,086.24 |
| 17 | 12/25/2014 | DG | 7/6/2014 – 7/12/2014 | $1,156.32 |

In violation of Title 18, United States Code, Sections 1028A and 2.

## COUNTS EIGHTEEN THROUGH NINETEEN

The grand jury further charges that:

1.     Paragraphs 1 through 98 of Count One and paragraphs 1 and 2 of Count Two are hereby incorporated by reference as if re-alleged herein.

2.     On or about the Dates of Claim set forth below, in the Western District of Pennsylvania and elsewhere, the defendant, LUIS COLUMBIE-ABREW, during and in relation to a felony violation of 18 U.S.C. § 1347 (Health Care Fraud), as charged in Count Two of this Indictment, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, and aided and abetted the same, to wit, the name and Recipient Number of Consumer SS:

| Count | Date of Claim | Consumer | Dates of Service | Amount Reimbursed |
|-------|---------------|----------|------------------|-------------------|
| 18 | 9/11/2015 | SS | 8/30/2015 – 9/5/2015 | $1,103.76 |
| 19 | 9/18/2015 | SS | 9/6/2015 – 9/12/2015 | $1,103.76 |

In violation of Title 18, United States Code, Sections 1028A and 2.

## COUNTS TWENTY THROUGHT TWENTY-TWO

The grand jury further charges that:

1.      Paragraphs 1 through 98 of Count One and paragraphs 1 and 2 of Count Two are hereby incorporated by reference as if re-alleged herein.

2.      On or about the dates set forth below, in the Western District of Pennsylvania and elsewhere, the defendant, TAMIKA ADAMS, during and in relation to a felony violation of 18 U.S.C. § 1347 (Health Care Fraud), as charged in Count Two of this Indictment, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, and aided and abetted the same, to wit, the name, address, Employee Identification Number, and Social Security number of Attendant TL-P and for the purpose of obtaining salary payments issued by MCI in TL-P's name:

| Count | Date of Payment | Attendant | Amount of Payment |
|-------|-----------------|-----------|-------------------|
| 20    | 11/29/2013      | TL-P      | $1,004.57         |
| 21    | 1/10/2014       | TL-P      | $1,005.43         |
| 22    | 1/24/2014       | TL-P      | $1,090.89         |

In violation of Title 18, United States Code, Sections 1028A and 2.

A True Bill,

Foreperson

SCOTT W. BRADY
United States Attorney
PA ID No. 88352